# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION – COLUMBUS

| | |
|---|---|
| Joe B. ALLMAN,<br>105 North Sugar Street,<br>McArthur, Ohio 45651,<br>                Plaintiff,<br><br>    -vs-<br><br><br><br><br><br>WALMART INC.,<br>702 SW 8th Street,<br>Bentonville, Arkansas 72716-8611,<br>                Defendant. | Case No. 2:18 CV 369<br><br>JUDGE SMITH<br><br>Mag Judge DEAVERS<br><br><br>AMENDED COMPLAINT<br>1.   Discrimination against disability<br>2.   Retaliatory constructive discharge<br>3.   Wrongful termination in violation of Ohio public policy<br><br>JURY DEMAND |

Now comes the Plaintiff by counsel and for his cause of action against the Defendant and its agents says the following:

## JURISDICTION

This Court has jurisdiction over this case involving state law tort claims based upon diversity of citizenship under 28 USC 1332 (a)(1) given the Plaintiff is a resident of Vinton County, Ohio and the Defendant conducts business in Ohio but has its corporate headquarters and principal place of business in Arkansas. The amount in controversy is in excess of $75,000.00 exclusive or interest and costs.

## FACTS

1. The Plaintiff Joe B. ALLMAN is a 57 year old professional truck driver who resides in Vinton County, Ohio.

2. Defendant WALMART INC. is an American multinational retail corporation that operates a chain of hypermarkets, discount department stores, and grocery stores. Headquartered in Bentonville, Arkansas, the company was founded by Sam Walton in 1962 and incorporated on October 31, 1969. It also owns and operates Sam's Club retail warehouses. As of January 31, 2018, Walmart has 11,718 stores and clubs in 28 countries, operating under 59 different names.

3. Defendant operates its business with duly authorized agents and has ratified their tortuous conduct discussed in this case in the alternative as conduct committed in further support of the Defendant's business goal of making a profit regardless of the cost to its employees and the public.

4. The Plaintiff last worked as a long-haul truck driver in the employ of the Defendant via its Walmart distribution center located at 1400 Old Chillicothe Road, Washington CH, Ohio 43160 in Fayette County.

5. The Plaintiff was paid a wage with benefits of about $100,000.00/year while employed at Walmart.

6. The Plaintiff was constructively discharged from his Walmart employment on or about 21 April 2014.

7. Prior to being discharged the Plaintiff operated tractor trailer equipment, with 53 footlong trailers over the Nation's highways for Walmart. The Plaintiff was a safe driver who never had an accident while so employed.

8. In August 2013 Walmart's vendor Fayette County Memorial Hospital by its physician assistant advised the Plaintiff that he suffered from sleep apnea after a DOT required fitness for duty examination was conducted on the Plaintiff. The physician assistant did not have the credentials to make such a diagnosis. The diagnosis was not made on any observed sleep apnea, but on measurements of the Plaintiff's neck size and body mass index while the Plaintiff

was not asleep.  Because of this alleged diagnosis, the said Hospital issued the Plaintiff a temporary driver medical fitness qualification card ("DOT" card) which meant he had to participate in a sleep study in the next 90 days or he could not get a permanent DOT card allowing him to drive without restrictions.

9. The Plaintiff participated in a sleep study on 8 OCT 2013 after being fitted with a continuous positive airway pressure or "C-PAP" machine, a kind of breathing mask system that covers the face and fits around the head, and the study was conducted in the sleeper cab of his truck while on the grounds of Defendant's Grove City, Ohio distribution center overnight.  A Walmart vendor called Advanced Home Medical conducted the sleep study.

10. "Advanced Home Medical" (AHM) in Columbus, Ohio fitted the Plaintiff's head with the C-PAP machine and determined from the data retrieved from it Plaintiff had sleep apnea and had stopped breathing 144 times in 6 hours, which is not possible, given that would have caused the Plaintiff to suffocate.  Plaintiff told Fayette County Memorial Hospital, and Advanced Home Medical and later SLEEP SAFE DRIVER, *infra*, that he did not suffer from sleep apnea and was ignored.

11. Upon receiving the AHM results, WALMART management required the Plaintiff to wear the C-PAP machine 5 nights a week for four hours a night as a condition of his continued employment.   A WALMART vendor called SLEEP SAFE DRIVER monitored the use of the machine and its data for WALMART management.

12. However, the C-PAP machine caused the Plaintiff to suffer nausea, headaches, bleeding mouth and throat, dehydration, and chronic cough and robbed him of sleep.  The Plaintiff told his supervisors at Walmart distribution center where he worked that he was in pain and could not use the C-PAP machine and he was ignored and told to continue to use it as a condition of employment in so many words.

13. When Plaintiff complained to Advanced Home Medical that the said C-PAP machine was causing an injury to him he was told to "live with it."  The Plaintiff later found out

from a manufacturer of the C-PAP machine that it settings have to be set by a medical doctor prescription and in the case of the Plaintiff, the machine was not. Moreover, the Plaintiff could not properly adjust the settings himself.

14. WALMART by its agent and vendor SLEEP SAFE DRIVER, instructed the Plaintiff that if he did not wear the C-PAP machine as instructed, he would be terminated from his employment. In fact when he did remove the machine from his head on occasion due to pain and suffering, a sensor in the device alerted SLEEP SAFE who then alerted Walmart and WALMART management would then suspend the Plaintiff from driving for five days each time it happened.

15. The Plaintiff has been told at least 20 other truck drivers at WALMART suffer from the same kind of painful experience using the C-PAP machined as he has.

16. In NOV 2013 the Plaintiff saw an ENT specialist who determined that the Plaintiff did not suffer from sleep apnea after he conducted a sleep study on the Plaintiff. The Plaintiff produced a detailed medical report on the issue to his employer and SLEEP SAFE DRIVER.

17. After this event SLEEP SAFE DRIVER's agent Sean KNIGHT would call and harass the Plaintiff and tell him to use the C-PAP machine in spite of the fact it was making him ill. KNIGHT told the Plaintiff if he did not wear the device he would be "pulled off the truck" and he in fact was by James MURPHY, WALMART Safety Manager per the recommendation of SLEEP SAFE DRIVER acting for WALMART as its authorized agent the first week of December 2013.

18. The Plaintiff was later suspended again for five days when his auxiliary power unit in his truck burned out and he could not use the C-PAP machine while sleeping in the sleeper cab of his truck.

19. On February 26, 2014 the Plaintiff was advised after another sleep study conducted by ADENA ENT AND ALLERGY that he did not have sleep apnea and both SAFE SLEEP DRIVER and Fayette County Memorial Hospital were wrong about their claims he did.

20. After seeing the ADENA results, WALMART management asked the Plaintiff to then return to Fayette County Memorial Hospital to get a permanent DOT card. The physician assistant there refused to concede the Plaintiff did not have sleep apnea as did AHM. However the Plaintiff was issued a new permanent, no-restrictions DOT driver's fitness for duty card.

21. On MARCH 6, 2014 the Defendant via manager Jim MURPHY advised the Plaintiff that WALMART wanted him to take another sleep study because the doctor hired by the Plaintiff who found he was not suffering from sleep apnea was not board certified and we can infer WALMART wanted to find a way to reject the medical evidence in favor of the Plaintiff. The fact is the Plaintiff's medical doctor was always board certified in ENT. When the Plaintiff showed MURPHY his doctor was board certified in ENT, MURPHY told the Plaintiff he was to take another sleep study anyway with a different vendor, Mid Ohio Sleep Center (MOSC), said study arranged for by SLEEP SAFE DRIVER. MOSC located its sleep study facility under the noisy glide path for airplanes landing and taking off from Columbus airport.

22. The doctors doing the sleep study for MOSC were the same doctors the Plaintiff accused of wrongfully diagnosing him with sleep apnea at AHM.

23. Before any results from any sleep study by MOSC came back, KNIGHT and MURPHY told the Plaintiff he had to wear the C-PAP machine for 3 consecutive nights before he could return to work at WALMART. When the Plaintiff pointed out to them they had no medical data to back up their demand, they repeated their orders to wear the device out of spite. Plaintiff refused on the grounds the machine was injuring his health and he was suspended from work.

24. The Plaintiff participated in the MOSC sleep study against his will and days later MOSC messaged the Plaintiff and told him the sleep study showed he had mild sleep apnea and he had to wear the said device 7 nights a week. The Plaintiff's medical evidence contradicts this provably false result as well as the fact the MOSC sleep study result was accurate.

25. The Plaintiff refused to continue to wear the C-PAP device, standing on his medical record and the fear of pain and suffering, and was not allowed to return to work by WALMART.

26. The Plaintiff advised WALMART management that he was being discriminated against based upon what amounts to a company manufactured perceived disability, sleep apnea, which was being used as a false excuse to prevent the highly compensated Plaintiff from continuing to work for the company no doubt with the intent to make him quit and seek work elsewhere so it could cut its overhead labor costs, and retaliated against for protecting himself from unfair, unjustified fitness for duty examinations, i.e. sleep study examinations, meant to find false grounds to terminate his employment; and WALMART chose to maintain its unfounded and cruel position that the Plaintiff must use the C-PAP device as a condition of his continued employment in spite of his complaints it was injuring him.

27. WALMART management was not acting out of an interest to protect the public on highways when it treated the Plaintiff adversely, but to punish the Plaintiff for refusing to be injured by a C-PAP machine as a condition of continued employment, and for protesting discrimination based upon disability after the Defendant spuriously regarded him as disabled because of sleep apnea and then held that condition against him in efforts to end his employment with WALMART for a pretextual reason.

28. No reasonable person would continue to return to work for an employer who requires the employee to suffer physical and mental pain, and fear, as a price for a paycheck and any employer could foresee its conduct would cause a person like the Plaintiff to resign from his job under the circumstances presented in this case. The Plaintiff's resignation was a constructive discharge under Ohio law.

29. As a direct, proximate and foreseeable consequence of the Defendant and its agents conduct, the Plaintiff was DAMAGED by the loss of valuable employment career and income and benefits, suffered humiliation and insult, pain and suffering both mental and physical, and was otherwise damaged. The Plaintiff was always qualified for his employment and ready to perform his job duties.

30.     The conduct of the Defendant was intentional and malicious.

31.     All following causes of action are incorporated herein.

ONE

32.     The conduct of the Defendant by and through its agents amounts to discrimination based upon perceived or claimed disability in violation of Ohio RC 4112.02 (A) and .99.  The Plaintiff was damaged as averred.

TWO

33.     The conduct of the Defendant by and through its agents amounts to retaliation in violation of Ohio RC 4112l.02 (I).   The Plaintiff was damaged as averred.

THREE

34.     Ohio has a public policy requiring employers to provide a safe workplace for their employees that may be gleaned from statutes and the common law.  *See, Kulch v. Structural Fibers*, 78 Ohio St. 3d 134 (1997); *Lightner v. CB&I Constructors, Inc.,* 2016 U.S. Dist. LEXIS 157243 *26-28, citing Ohio general safe workplace requirement statutes RC 4101.11 and .12 as a source of clear Ohio public policy to underpin wrongful termination case alleging facts showing employer violated duty to provide safe workplace, summary judgment denied; *Blair v. Honda of Am. Mfg.*, 2002 Ohio App. LEXIS 1072 (2002)(firing employee who could not work due to incurring illness caused by unsafe work environment violates Ohio public policy, summary judgment denied); *Pytlinski v. Brocar Prods.*, 94 Ohio St. 3d 77 (2002) at syllabus ("Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted"); *Blackburn v. American Dental Ctrs.,* 2014 Ohio App. LEXIS 5159 *27, *29 (10th Dist.) (finding employee terminated after making accusation showing RC 4101.11 and 12 violated by employer states clear public policy in issue in case, **rejecting** Sixth Circuit decision in *Whitaker v. FirstEnergy Nuclear Operating Co*. (CA6 2013) finding these statutes are "too general" to base a claim upon when reviewing defense summary judgment motion, MSJ denied).

34. The Defendant has a duty to the public and the Plaintiff to not subject the Plaintiff as a condition of his continued employment as it has in this case to personal injury and/or make him suffer pain, or risk being made into an unsafe truck driver because of fatigue under the said public policy to provide a safe workplace. The policy underpinning Ohio RC 4101.11 and 12 and case law are what is in issue in this case, not the text of any statute.

35. The reason the said Ohio public policy exists in part is so that the Plaintiff is kept safe and injury free and able to continue to work and provide for his family, and the public traveling on the highways are not at risk for accidents caused by the Plaintiff's truck hitting their vehicles and causing death, dismemberment, widowhood, and emotional trauma, among other things because he has been impaired by the Defendant's punishing CPAP machine negatively impacting his health and readiness for driving duty.

36. The conduct of the Defendant acting by its agents and itself in requiring the Plaintiff to tolerate this <u>unsafe condition at work as a condition of continued employment</u> by use of a C-PAP machined that caused him to suffer mental and physical injury is an affront to the clear public policy of Ohio expressed in case law and statutes that employees will be provided with a safe workplace and an employer will not intentionally require an employee to suffer injurious harm as a condition of continued employment.

37. The Defendant's conduct jeopardized the public policy of Ohio when it subjected the Plaintiff to mental and physical pain and then constructively terminated his employment as discussed *supra*. The Defendant acted maliciously with no intention to abide by the public policy of Ohio at issue in this case but acted with an ulterior motive to make money at the expense of public safety and the safety of the Plaintiff.

38. The Defendant's conduct jeopardized the public policy of Ohio when it subjected the Plaintiff and his similarly situated co-workers to mental and physical pain by forcing them to use a C-PAP machine without a medical prescription and then constructively terminated Plaintiff's employment because of a desire to violate the public policy as discussed *supra*.

39. There is no overriding business justification that excuses the Defendant's conduct in constructively discharging the Plaintiff, as Defendant creating an unsafe workplace condition that threatens the Plaintiff and Ohio public safety and causes a dangerous health condition to be suffered by the Plaintiff as a condition of employment cannot be justified by an employer's desire to engage in any business to make money.

WHEREFORE, the Plaintiff demands JUDGMENT against the Defendant in an amount of money in excess of one million dollars for compensatory and punitive damages, interest, costs and attorney fees for all causes of action herein.

## JURY DEMAND

The Plaintiff demands a trial by jury on all causes of action herein.

Respectfully Submitted,

/s/ Michael Terrence Conway, Esq.
Michael T. Conway, Esq.
Ohio Reg. No. 0058413
SD Texas Reg. No. 925875
Michael T. Conway and Company
3456 Sandlewood Dr.
Brunswick, Ohio 44212
(330) 220-7660 (voice-fax)
Xray2Alpha@aol.com

<u>SERVICE</u>

Counsel for the Plaintiff hereby certifies that a copy of the foregoing document was served on opposition counsel on 17 JULY 2018 by this Court's ECF System at the following address:

>Alison M. Day, Esq.
>Benjamin W. Mounts, Esq.
>Littler Mendelson PC
>Fifth Third Center, 21 East State Street
>16th Floor
>Columbus, Ohio 43215

<u>/s/ Michael T Conway, Esq.</u>