UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Joe Allman,**

 **Plaintiff,**       :    Case No. 2:18-cv-369

 v.             Judge Sarah D. Morrison
             :    Chief Magistrate Judge Elizabeth P. Deavers

**Walmart Inc.,**

 **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 35.) Plaintiff filed a Memorandum in Opposition to the Motion (ECF No. 42), and Defendant filed a Reply (ECF No. 43). The matter is now ripe for decision.

### I. BACKGROUND AND STATEMENT OF THE FACTS

Federal law requires that individuals who drive commercial motor vehicles must be "medically certified as physically qualified to do so . . . ." 49 C.F.R. § 391.41(a)(1)(i) (2019). A person is not "physically qualified" if he or she has an "established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely . . . ." *Id.* § 391.41(b)(5). Sleep apnea can be one such "respiratory dysfunction." *Id.* Pt. 391, App. A (E)(3).

In order for a driver to be "medically certified" he or she must have a medical examination. *Id.* § 391.41(a)(3). This medical examination generally must be conducted by a medical examiner listed on the National Registry of Certified Medical Examiners (the "Registry"). *Id.* § 391.43(a). The medical examiners on this Registry must meet specific requirements—for example, they must "[b]e knowledgeable of the specific physical and mental

1

demands associated with operating a commercial motor vehicle" and of the surrounding regulatory requirements. *Id.* § 391.43(c). If during a driver's medical examination a "medical examiner detects a respiratory dysfunction[] that in any way is likely to interfere with the driver's ability to safely control and drive a commercial motor vehicle, the driver must be referred to a specialist for further evaluation and therapy." *Id.* Pt. 391, App. A (E)(3).

Turning to the facts of the case at bar, Plaintiff Joe Allman began working as a truck driver for Defendant Walmart Inc. ("Walmart") in October 2006. (Joe Allman Dep., 9:12–13, 13:1–4, ECF No. 33.) In this position, Mr. Allman was required to have an annual medical exam according to the regulatory scheme outlined above. (*Id.* 24:2–11.)

In 2013, Walmart instituted a sleep apnea policy through which Walmart would pay for sleep apnea screening and any necessary medical equipment for its truck drivers. (*Id.* 21:16–19, 23:4–24:1.) This program was overseen by a company called SleepSafe Drivers ("SleepSafe"). (*Id.* 30:10–17.)

Around the time that this policy was instituted, Mr. Allman went for his 2013 medical exam and was examined by a physician's assistant, David Burton. (*Id.* 25:11–16, 27:15–24.) Mr. Allman filled out a form in conjunction with this exam, and in response to the question of whether he had any "[s]leep disorders, pauses in breathing while asleep, daytime sleepiness, [or] loud snoring," he answered "yes." (*Id.* 26:3–10; ECF No. 33-1, at 9.) Based on the answer to this question, as well as Mr. Allman's body mass index and neck circumference, Mr. Burton referred Mr. Allman for a sleep study to be tested for sleep apnea. (*Id.* 28:12–29:6.)

Mr. Allman subsequently underwent a sleep study conducted by Advanced Home Medical ("AHM"), a company that contracts with SleepSafe. (*Id.* 30:18–22; James Murphy Dep. 63:14–16, ECF No. 34.) After this initial sleep study, AHM diagnosed Mr. Allman with sleep

apnea and gave him a Continuous Positive Airway Pressure ("CPAP") machine. (Allman Dep. 29:24–30:14, 32:18–20; ECF No. 33-1, at 20.) AHM instructed Mr. Allman to wear the machine for four hours per night when sleeping in his truck. (Allman Dep. 32:21–33:10.) This aligns with Walmart's policy, which required Mr. Allman to use the machine for four hours per night for seventy percent of his sleeping nights. (Murphy Dep. 38:10–39:4.)

Mr. Allman tried using the CPAP machine, but he found the air pressure to be too high. (Allman Dep. 33:14–16, 41:4–15.) The machine interfered with his sleep and caused him to suffer adverse symptoms, such as severe headaches, nosebleeds, and dry mouth. (*Id.* 42:12–16.) Mr. Allman complained about the difficulties he was having to his supervisor, John Coburn; another Walmart manager, Jesse Judge; and to Sean Knight, a SleepSafe employee. (*Id.* 41:23–42:2, 44:18–45:14, 57:17–58:4; Murphy Dep. 18:1–3.) Walmart told Mr. Allman that if he did not use the CPAP machine as he was instructed, he would not be permitted to drive. (Allman Dep. 33:1–7.)

Eventually, Walmart deemed Mr. Allman to be out of compliance with these instructions and told him that he would be suspended if he did not use his CPAP machine as instructed. (*Id.* 41:7–11.) The first time Mr. Allman was suspended for noncompliance, he was told that he needed to use the CPAP machine for five days in a row to drive again. (*Id.* 46:7–19.) He complied, and he was able to return to work. (*Id.* 46:14–22.) However, while Mr. Allman tried to use the machine, he repeatedly failed to meet Walmart's requirements. (*Id.* 54:16–19.)

In February 2014, Mr. Allman underwent another sleep study, this time of his own accord, at Adena Hospital, and the doctor performing the study told Mr. Allman that he did not have sleep apnea. (*Id.* 60:2–21.) After receiving these test results on February 26, 2014, Mr. Allman permanently stopped wearing the CPAP machine. (*Id.* 61:4–6, 62:13–15.) Mr. Allman

subsequently provided the results of this test to Walmart. (*Id.* 61:7–9.) In response, James Murphy, Walmart's Operations Safety Manager, contacted Mr. Allman and told him that Walmart wanted Mr. Allman to undergo another sleep study. (*Id.* 62:16–23.) Mr. Allman claims that Walmart disputed whether the doctor who performed the test at Adena Hospital was "board certified." (*Id.* 65:6–14.) Mr. Allman insists that his doctor was board certified in sleep medicine. (*Id.* 65:21–66:9.) Walmart agrees that it questioned the validity of the test results but claims to have requested another sleep study not because it disputed the results necessarily but because the results conflicted with AHM's findings. (Murphy Dep. 69:21–70:19.)

On March 7, 2014, Mr. Allman went for another SleepSafe sleep study, after which SleepSafe representatives concluded again that Mr. Allman had sleep apnea and told him that he would need to wear the CPAP machine every night for eight hours per night. (Allman Dep. 79:3–5, 80:18–81:2; ECF No. 33-1, at 40.) Mr. Murphy subsequently told Mr. Allman that he would need to wear the CPAP for three consecutive nights before he could return to work and that he needed to take another sleep apnea test on account of the mixed results. (Allman Dep. 87:9–23, 88:11–24.) Mr. Allman did not comply with these instructions. (*Id.* 90:7–10.)

On April 2, 2014, Mr. Allman reported to his work location, but Mr. Coburn told him that he was not permitted to work because he had not worn his CPAP machine as instructed. (*Id.* 91:15–92:10.) Mr. Allman then returned his CPAP machine to Walmart because he did not believe he had sleep apnea and therefore did not need the CPAP machine. (*Id.* 92:15–93:24.) In doing so, Mr. Allman knew that he would not be permitted to return to work because Walmart believed that he did have sleep apnea and was insisting on him using the CPAP machine. (*Id.* 93:19–24; ECF No. 33-1, at 45.) After turning in the CPAP machine, Mr. Allman removed his

personal items from work and left behind his uniform. (ECF No. 33-1, at 45.) This was the last day that Mr. Allman reported for work. (Allman Dep. 96:20–97:2.)

Over the next two weeks, Mr. Allman had three conversations with John Coburn. (*Id.* 95:11–96:14.) During one of these conversations, Mr. Coburn told Mr. Allman that he had seven days to take the conflicting reports from his February 2014 and March 2014 sleep studies to a third-party doctor designated by Walmart. (*Id.* 97:22–98:22.) It was expected that this doctor would examine these conflicting reports and determine which report should be credited—that is, determine whether Mr. Allman had sleep apnea. (*Id.* 98:2–6, 100:21–101:1; ECF No. 33-1, at 46.) Mr. Allman was aware that he would be fired if he did not follow these instructions. (Allman Dep. 101:2–14.) Nevertheless, he refused to comply, and on April 21, 2014, Mr. Allman resigned his position. (*Id.* 101:23–24, 105:5–8.)

Mr. Allman does not believe that Walmart was trying to get him to quit or to prevent him from working. (*Id.* 108:13–24.) Rather, Mr. Allman acknowledges that Walmart was convinced that he had sleep apnea, a conclusion with which he vehemently disagreed. (*Id.* 93:22–24.)

On July 17, 2018, Mr. Allman filed an Amended Complaint against Walmart, alleging disability discrimination (Count One), retaliation (Count Two), and wrongful termination (Count Three) in violation of Ohio public policy. (Amended Compl., ECF No. 11.) On February 11, 2019, this Court granted Walmart's motion to dismiss Count Three. (ECF No. 31.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element

of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### III. ANALYSIS

Walmart has moved for summary judgment on both Counts One and Two. (ECF No. 35.) However, after Walmart filed its motion, Mr. Allman voluntarily dismissed Count One. (ECF No. 40.) Accordingly, Walmart's Motion for Summary Judgment as to Count One is **DENIED** as moot.

Turning to Count Two, Mr. Allman has brought a claim of disability retaliation under state law. Ohio Rev. Code Ann. § 4112.02(I) (West 2019). To make out a *prima facie* case of disability retaliation, a plaintiff must prove that he engaged in protected activity, he suffered an adverse employment action, and there is a causal link between the protected activity and the adverse employment action. *Johnson v. Univ. Hosps. Physician Servs.*, 617 F. App'x 487, 492

(6th Cir. 2015). Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for termination. *Id.* If the defendant satisfies that burden, the plaintiff must prove that the defendant's proffered explanation is pretextual. *Id.*

The Court begins with the first element of the *prima facie* case—protected activity. Ohio's anti-retaliation statute mirrors the Title VII retaliation statute. *Compare* Ohio Rev. Code Ann. § 4112.02(I) ("It shall be an unlawful discriminatory practice . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing . . . ."), *with* 42 U.S.C. § 2000e-3(a) (2018) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). Accordingly, retaliation claims under Ohio law are analyzed the same way as under federal law. *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 329–30 (6th Cir. 2013).

The Ohio retaliation statute (like Title VII) contains what is known as a "participation clause" and a "opposition clause." *Id.* at 330. Mr. Allman never alleges that he engaged in any conduct falling within the participation clause (i.e., that he made any formal charges of discrimination or participated in any investigation). As a result, his claim can only fall within the confines of the opposition clause.

7

The scope of the opposition clause is narrower than the scope of the participation clause. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) ("[F]ederal courts have generally granted less protection for opposition than for participation in enforcement proceedings."). "'[T]he opposition clause does not protect all opposition activity.'" *Id.* (quoting *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986)). An employee's activity is protected by the opposition clause if he has "'opposed any unlawful discriminatory practice.'" *Mengelkamp*, 549 F. App'x at 330 (quoting Ohio Rev. Code Ann. § 4112.02(I)). "An employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Booker*, 879 F.2d at 1312. In opposing an apparently discriminatory practice, the employee must "have a good faith belief that the practice is unlawful." *Id.* at 1312–13.

Under the opposition clause, the term "oppose" carries its ordinary meaning. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009). It means, for example, to resist or antagonize. *Id.* Mr. Allman has established that he complained about Walmart's sleep apnea policy—at least as it was applied to him—and the Court assumes that this constitutes sufficient "opposition" to fall within the opposition clause.

As for the second component of the clause, the conduct that the plaintiff is opposing must be conduct that the plaintiff reasonably believes, in good faith, to be unlawful. *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016). The relevant question is not whether the policy necessarily *is* unlawful. *Id.* The plaintiff "must 'actually believe that the conduct complained of constituted a violation of relevant law' and 'a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee' would believe that the conduct complained of was unlawful." *Yazdian v. ConMed Endoscopic Techs.,*

8

*Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (quoting *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)).

Mr. Allman argues that his complaints about his forced use of the CPAP machine constitute protected activity because of an employee's right to refuse a disability accommodation under § 12201(d) of the Americans with Disabilities Act ("ADA"). However, Mr. Allman has presented no evidence that he "actually believed" that Walmart's insistence that he use the CPAP machine violated the ADA.

Indeed, Mr. Allman has presented zero evidence that he ever told Walmart that he thought its policy was unlawful, or that he ever even alleged that Walmart's policy was discriminatory. (Allman Dep. 21:2–7.) Mr. Allman only ever complained that he should not be required to use the machine because he did not believe he had sleep apnea and because the machine caused him to suffer adverse side effects. This does not demonstrate that Mr. Allman acted under a good faith belief that Walmart's sleep apnea policy was unlawful. Instead, Mr. Allman's argument smacks of *ex post facto* rationalization. The record evidence shows that Mr. Allman never complained that he had a right to refuse the CPAP machine under the ADA until the commencement of this litigation.

Mr. Allman's conduct makes quite clear that he did not believe that the practice was unlawful but rather he only disputed whether it applied to him. Mr. Allman's obstreperous refusal to use the CPAP machine stemmed only from his insistence that he did not have sleep apnea and his disdain for the machine. This is evidenced by Mr. Allman's refusal to cooperate with Walmart's requests after receiving the diagnosis from Adena Hospital that he did not have sleep apnea. Mr. Allman's stubborn insistence that his doctors were right and the doctors hired by Walmart were wrong does not demonstrate that he acted in good faith. This is particularly so

9

when Walmart gave Mr. Allman a chance to go to another doctor to reconcile the conflicting medical reports, and Mr. Allman flat-out refused. This is evidence of insubordination, not protected opposition.

Even assuming that Mr. Allman had a good-faith belief that Walmart's policy violated § 12201(d) of the ADA and that his conduct constituted protected activity, his argument under § 12201(d) still fails to demonstrate the causal link between the protected activity and the adverse employment action. To prove a causal link, the plaintiff must prove that "but for" his protected activity Walmart would not have taken the alleged adverse employment action. *See Equal Emp't Opportunity Comm'n v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

Mr. Allman argues that because Walmart's sleep apnea policy was itself discriminatory under § 12201(d), Walmart cannot rely on the policy as a reason for disciplining him or threatening his termination. (Def. Resp. to Mot., at 22, ECF No. 42.) This argument ignores one of the regulations associated with § 12201(d), which specifically says that if an "individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified." 29 C.F.R. § 1630.9(d) (2019).

Because Mr. Allman had a clinical diagnosis of sleep apnea, federal regulations deemed him not "physically qualified" to operate a commercial motor vehicle. Regardless of whether Mr. Allman took another test resulting in a diagnosis that he did not have sleep apnea[1], based on the uncontested facts, it was reasonable for Walmart to take the steps that it did to ensure its

---

[1] Mr. Allman presents no evidence that this test would qualify under federal law, because federal regulations require that the medical examination be conducted by a medical examiner listed on the Registry. Mr. Allman has not presented any evidence that the doctor who conducted this test is listed on this Registry.

compliance with the federal regulations surrounding the qualifications of commercial drivers. *See Butler v. Wash. Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 82 (D.D.C. 2017) (holding that defendant's sleep apnea policy struck "an eminently reasonable balance between the individual interests of employees with disabilities and the safety standards" required by federal law); *cf. Pena v. City of Flushing*, 651 F. App'x 415, 421 (6th Cir. 2016) ("'The ADA is a shield against discrimination on the basis of disability; it is not a sword enabling employees who are not, in fact, substantially limited in any major life activity to refuse reasonable requests' by their employers and then use that statutorily-grounded request to plead a[n ADA] claim." (quoting *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 705 (4th Cir. 2001))). Notably, Mr. Allman recognizes that Walmart genuinely believed that he had sleep apnea. (Allman Dep. 93:19–24.) The sincerity of Walmart's belief is further borne out by Walmart's instruction to Mr. Allman to take the conflicting medical reports to another doctor in an apparent effort to reconcile the conflicting medical evidence and settle the matter. And it follows that Walmart genuinely believed that it needed to ensure that Mr. Allman's assumed sleep apnea was being managed in compliance with federal regulations.

It is this Court's role to assess whether Walmart's demand that Mr. Allman use his CPAP machine was a demand that the company could legitimately make, not whether it was the best decision or the correct decision or even a fair decision. It is not this Court's role to "sit as a 'super-personnel department,' second-guessing management decisions." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)).

Mr. Allman has not offered sufficient evidence to prove that he opposed what he believed in good faith to be an unlawful discriminatory practice, so he has not proven that he engaged in

11

any "protected activity." Nor has Mr. Allman proven that his allegedly protected activity was the "but for" cause of the alleged adverse employment action. Accordingly, he cannot establish a *prima facie* case of retaliation. His claim thus fails, and the Court need not proceed any further in the retaliation analysis. Based on Mr. Allman's lack of evidence to support these essential elements of his claim, Walmart is entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED** as to Count Two and **DENIED** as moot as to Count One.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**